**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION**

**ANDY ELLIS, JR.**                                                                                   **Plaintiff**

**v.**                                                                   **No. 1:23-cv-00060-MPM-DAS**

**SPECIALTY ORTHOPEDIC GROUP OF
MISSISSIPPI, PLLC, et al.**                                                     **Defendants**

**MEMORANDUM OPINION**

This cause comes before the Court on Plaintiff Andy Ellis, Jr.'s Motion for Declaratory Judgment [155]. Defendants have responded in opposition to the motion [178]. The Court, having reviewed the record and carefully considered the applicable law, is now prepared to rule.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

This case arises from a tragic chain of events which led to Mr. Ellis' lifelong paralysis in his lower extremities and loss of continence. The Court relies upon the facts as previously stated in its Order denying North Mississippi Medical Center's ("NMMC") Motion for Judgment on the Pleadings [68]. The relevant facts are as follows:

In early 2021, Andy Ellis consulted Dr. Andrew Vecchione at Specialty Orthopedic Group of Mississippi, PLLC ("SOG") for treatment of his lower back pain. After trying several different approaches without success, Dr. Vecchione recommended that Mr. Ellis undergo a trial placement of a Medtronic spine stimulator. Mr. Ellis had the procedure on April 8, 2022, and was discharged with instructions to contact SOG if the incision demonstrated signs of infection, redness, swelling, pain, fever, chills, or weakness.

After the procedure, Mr. Ellis began experiencing severe back pain, fever, vomiting, and difficulty moving. He reported these symptoms to SOG, as instructed, but was assured that such

complaints were not cause for alarm. By the time Mr. Ellis arrived at SOG for his follow-up appointment on April 15, 2022, his pain was so severe that he was unable to stand. Mr. Ellis reiterated his worsening symptoms to Dr. Vecchione and his staff, but he was again told that such symptoms were normal. The redness and swelling of the surgical site were attributed to heat rash, and Dr. Vecchione advised Mr. Ellis that fever and nausea were to be expected. The Medtronic simulator leads were removed, and Mr. Ellis was discharged home.

Over the next few days Mr. Ellis's condition continued to deteriorate, and by April 18, 2022, he was unable to move his legs. That night, Mr. Ellis was transported to NMMC via ambulance and arrived in the emergency room at 10:30 PM. Though Mr. Ellis was evaluated by a graduate nurse at 12:51 AM, he was not evaluated by a physician until Dr. Misty Rea assessed him at 1:44 AM. Dr. Rea noted that Mr. Ellis' bloodwork showed signs of infection and that his spine would require radiologic evaluation. Despite these findings, Dr. Rea neither administered antibiotics nor requested the necessary imaging.

After nine hours in the emergency room, Mr. Ellis was transferred to observation status under the care of Dr. Nathaniel Eisenhut, but he still had not received any treatment other than pain medication. Sometime after 7:30 AM on April 19, an MRI of Mr. Ellis' spine was ordered for the first time. Mr. Ellis finally underwent an MRI on April 20, which revealed a spinal epidural abscess and spinal cord compression. Though Mr. Ellis had surgery the following day to relieve the pressure on his spine, he now suffers from permanent lower extremity paralysis, bowel incontinence, and bladder incontinence.

Based on these alleged facts, Mr. Ellis brought suit asserting that the defendants' acts violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 14 U.S.C. § 1395dd, and amounted to medical negligence actionable under state law. Specifically, Mr. Ellis

argues that "[d]ue to the unacceptable delay in diagnosis, management, and treatment of Plaintiff's spinal epidural abscess, including NMMC's failure to appropriately screen and stabilize Plaintiff pursuant to the requirements of EMTALA, Plaintiff now suffers from permanent lower extremity paralysis and incontinence." [59]

On September 5, 2023, NMMC moved for dismissal arguing that the Amended Complaint does not state an EMTALA claim upon which relief may be granted and that this Court should decline to exercise supplemental jurisdiction over the remaining state law claims. The Court denied NMMC's motion holding that Mr. Ellis had sufficiently pled a cause of action under EMTALA, and it would continue to exercise jurisdiction over Mr. Ellis' claims.

At this stage in the proceedings, Mr. Ellis seeks an order from the Court declaring that, if the defendant-physicians Misty Rea, M.D., Nathanael Eisenhut, D.O., Bradley Boldizar, M.D., Mahesh Bhatt, M.D., and Carl Bevering, M.D. are found responsible for Mr. Ellis' injuries, NMMC is vicariously liable for the actions and inactions of these individual physicians. NMMC opposes the motion arguing that Mr. Ellis is not entitled to declaratory relief as he seeks a partial summary judgment on a putative claim that is not asserted in the complaint, and NMMC cannot be held vicariously liable for the actions of certain physicians under *Hardy v. Brantley*, 471 So. 2d 358 (Miss. 1985). NMMC concedes that it would be vicariously liable for any proven causal negligence by the plaintiff related to Bradley Boldizar, M.D., Mahesh Bhatt, M.D., and Carl Bevering, M.D. as they were hospital employees. For this reason, Mr. Ellis' motion as to these defendants is moot.

## STANDARD OF REVIEW

Under the Declaratory Judgment Act, the district court may, in a case of actual controversy within its jurisdiction, "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a).

3

"A determination of whether to grant declaratory relief is within the district court's discretion." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 824 F.3d 507, 523 (5th Cir. 2016). The two principal criteria guiding the district court's decision of whether to render a declaratory judgment are "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id*. (quoting *Concise Oil & Gas P'ship v. Louisiana Intrastate Gas Corp.*, 986 F.2d 1463, 1471 (5th Cir. 1993)).

However, "a declaratory judgment proceeding is primarily intended to determine the meaning of a law or a contract and to adjudicate the rights of the parties therein, but not to determine controversial issues of fact." *Raynes v. City of Great Falls*, 696 P.2d 423, 427 (Mont. Sup. Ct. 1985). "Although a declaratory judgment is not precluded if it involves disputed questions of fact, a declaratory judgment cannot be issued to resolve a disputed question of fact that is a determinative issue." *Maryland Enter., LLC v. United States*, 93 Fed. Cl. 658, 664 (2010).

Whereas, under Federal Rule of Civil Procedure 56, summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The purpose of the [summary judgment] procedure is to pierce the pleadings and to assess the evidence to determine if there are any genuine issues of material fact requiring a trial." *Moon v. Safeway Ins. Co. of Louisiana*, 353 So. 3d 352, 355 (La. App. 4 Cir. 2022). Facts are material if they "'potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute.'" *Id*. at 356 (quoting *Louisiana Bank v. Williams*, 591 So. 2d 375, 377 (La. App. 3d Cir. 1991)).

4

**ANALYSIS**

Mr. Ellis asserts that he is entitled to declaratory relief pursuant to the apparent-agency principles affirmed in *Hardy v. Brantley*, 471 So. 2d 358 (Miss. 1985) and *Gatlin v. Methodist Medical Center, Inc.*, 772 So. 2d 1023 (Miss. 2000). He contends that declaratory judgment is appropriate as it will preserve judicial economy and streamline the litigation by allowing him to dismiss the individual physicians as defendants.

An actual controversy falls within the Court's jurisdiction, and a judgment on this matter may serve a useful purpose in clarifying and settling these issues. However, there remains a genuine dispute of material fact regarding whether Mr. Ellis was notified of the employment status of the treating physicians. The dispositive issue in resolving this dispute is whether Mr. Ellis' fiancée had the authority to sign the consent form on his behalf, thereby waiving his acknowledgment of the physicians' employment status.

Regarding the issue of whether NMMC should be held liable for the actions or inactions of the physicians, the vicarious liability and *respondeat superior* laws of the state of Mississippi control. In his amended complaint, Mr. Ellis sufficiently pled that the negligence of such employees, agents, and/or representatives are attributable to NMMC under the doctrines of vicarious liability and *respondeat superior* through application of *Hardy v. Brantley*, 471 So. 2d 358 (Miss. 1985) and *Gatlin v. Methodist Medical Center, Inc.*, 772 So. 2d 1023 (Miss. 2000). *Pl.'s Am. Compl.* ¶¶ 182-83 [8]. Under these seminal Mississippi Supreme Court cases, it is generally accepted that a hospital will be held vicariously liable for damages caused by physicians specifically "where the patient engages the services of the hospital without regard to the identity of a particular physician and where as a matter of fact the patient is relying upon the hospital to deliver the desired health care and treatment." *Hardy*, 471 So. 2d at 371.

In *Hardy*, Brad Ewing was suffering from severe lower abdominal pain and was taken by his brother to the emergency room at Hinds General Hospital. *Id*. at 360. Both Mr. Ewing and his brother testified that they did not seek the services of any particular physician, but rather sought emergency care from whatever health care personnel was available at the hospital. *Id*. Mr. Ewing was treated by Dr. Brantley, an emergency services physician, but released prematurely and died the following day due to a perforated duodenal ulcer and peritonitis, both easily diagnosable and treatable conditions. *Id*. at 361. Although the hospital contracted with a provider of emergency room physicians, thereby disclaiming liability for any negligence attributable to the physicians, the court concerned itself more with "the rights and duties of the hospital vis-a-vis the patient, not the emergency room physician" and found the hospital liable for the negligence of Dr. Brantley, notwithstanding Dr. Brantley's status as an independent contractor. *Hardy*, 471 So. 2d at 369. The court's rationale is rooted in the principles of apparent agency set out in Restatement (Second) of Torts § 429 (1966) which provides:

> One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

The court relied heavily on the principle that "unless there is some reason for a patient to believe that the treating physician in a hospital is an independent contractor, it is natural for him to assume that he can rely upon the reputation of the hospital as opposed to any doctor, which is the reason he goes there in the first place." *Id*. at 370.

NMMC contends that the case at bar is distinguishable from *Hardy* for two reasons: (1) NMMC did not select the physicians in question but they were instead selected and employed by a third-party provider, and (2) Mr. Ellis had no knowledge of the identity of the physicians who

6

would be providing treatment, or in other words, Mr. Ellis had no knowledge that the physicians were *not* employees of NMMC. To support its initial defense, NMMC interprets the *Hardy* court's rationale as a balancing test, weighing factors such as billing and salary, control over the physician's professional judgment, and the patient's reliance on the hospital and lack of knowledge of the physician's employment relationship with the hospital. However, this Court interprets *Hardy* in much simpler terms, prioritizing the court's concern for "the rights and duties of the hospital vis-a-vis the patient, not the emergency room physician." 471 So. 2d at 369. Mr. Ellis claims that he sought treatment from NMMC without knowledge of the physicians on staff or their status as independent contractors, but for the reputation of the hospital and his desperate need for emergency medical care.

Nonetheless, *Hardy* dealt with a nearly identical situation to the case at bar, where the hospital contracted with a third-party provider to furnish its emergency services physicians. NMMC contends that it did not select Dr. Rea or Dr. Eisenhut, it had no control over their professional judgments, and it did not bill the physicians directly for their work. Likewise, the third-party provider in *Hardy* was solely responsible for furnishing the emergency services physicians, the hospital did not exercise control or direction over the professional work and functions of the physicians, the physicians did not maintain an office at the hospital, and fees for services rendered by the physicians were determined by the third-party provider. *Id*. at 361-62. The Court finds no basis to treat this case any differently, and therefore, NMMC's initial argument is unpersuasive.

Secondly, NMMC argues Mr. Ellis' assertion that he had no knowledge that the physicians were not employees of NMMC does not meet the evidentiary burden of reasonable belief necessary to invoke the apparent-agency doctrine. NMMC also contends that Mr. Ellis was notified of the

7

physicians' employment status when his fiancée signed the Consent for Treatment, Admission, and Release of Health Information form upon his admission to the hospital, which read in part:

> I acknowledge that many physicians on the medical staff of the Hospital are not employees or agents of the Hospital, but are independent physicians who have been granted the privilege of using Hospital facilities for the care and treatment of their patients.

The Court would be mistaken to interpret Mr. Ellis' *lack* of knowledge as evidence that he in fact *did* have knowledge the physicians were independent contractors and were not employees of the hospital. As the *Hardy* court affirmed, it is reasonable to assume that physicians providing treatment at a hospital are employed by that hospital unless the patient is informed otherwise. This leads the Court to consider whether Mr. Ellis was made aware of the treating physicians' employment status.

> Regarding the consent form, Mr. Ellis swears by affidavit the following:
>
> 4. I was not referred to any specific physician at North Mississippi Medical Center, and I did not present to North Mississippi Medical Center to engage the services of any particular physician.
> 5. I sought the services of North Mississippi Medical Center without regard to, or knowledge of, the identity of the physicians at North Mississippi Medical Center.

A similar case was brought before the Northern District of Mississippi. *Bollwitt v. Baptist Mem'l Hosp.-Golden Triangle, Inc.*, No. 1:20-CV-112-SA-DAS, 2022 WL 3638146 (N.D. Miss. Aug. 23, 2022). Mr. Bollwitt, the patient-plaintiff, asserted that Baptist Memorial Hospital was vicariously liable for the purported negligence of his treating physicians, although the physicians were not employees of the hospital but were contracted through a third-party provider. However, Mr. Bollwitt's spouse signed an admission form on his behalf when he was admitted to the hospital which stated in part:

> I understand that my admitting and consulting physician(s) … are engaged in the practice of their professions on behalf of themselves or other corporations *and are*

8

> *not employees or agents of the facility* … The facility is not responsible for their acts or omissions, and I will not attempt to hold the facility responsible for their acts or omissions. *If I want to know the employment status/affiliation of any health care provider, I will ask questions to satisfy myself of their status sufficient to make informed decisions regarding the employment status/affiliations of the various health care providers.*

*Bollwitt*, 2022 WL 3638146, at *4. Baptist also provided photos of signage that was placed around the hospital regarding the employment status of the physicians working at the facility. Considering this evidence, the court acknowledged both arguments. On the one hand, the admission form and signage "provide[d] information such that a reasonable person could be on notice that providers were not Baptist employees" and that this information "cuts against the independent contractor status being completely beyond the Bollwitts' knowledge or perception." *Id*. at *6. But on the other hand, "the Court is cognizant of the allegations in [Mr. Bollwitt]'s affidavit—particularly, that he did not read the form and that he did not see the signs Baptist contends were placed in the emergency department." *Id*. The court notes, however, that Mr. Bollwitt's allegations are subjective in nature as to his state of mind and that summary judgment would be improper at this stage in the proceedings. *Id*. The court held that these issues presented questions of fact which should be resolved by a jury at trial. *Id*.

With this persuasive authority in mind, the Court turns to the facts of the case *sub judice*. Mr. Ellis swears by affidavit that he was not referred to any specific physician at NMMC, he did not present to NMMC to engage the services of any particular physician, and he sought the services of NMMC without regard to, or knowledge of, the identity of the physicians. NMMC does not contend there was signage posted around the hospital or emergency room notifying patients of their physicians' employment status. Mr. Ellis did not sign the consent form regarding the employment status of his treating physicians; however, Mr. Ellis' fiancée signed the consent form

9

on his behalf upon his admission to NMMC. At the heart of this controversy is also the issue of whether Mr. Ellis' fiancée had proper authority to sign the consent form on his behalf. The evidence presented to the Court is likewise insufficient to resolve this matter, leaving the factual issues of consent and authority in dispute.

The Court empathizes with Mr. Ellis' emergent and agonizing condition when he presented to the hospital and acknowledges that Mr. Ellis may have never seen nor read the consent form signed by his fiancée. However, what lies before the Court at this time is a genuine issue of fact that requires further development by the parties. Therefore, a judgment on this matter is premature.

## CONCLUSION

For the reasons stated above,

**IT IS, THEREFORE, ORDERED** that Plaintiff's Motion for Declaratory Judgment [155] is **DENIED** as there are dispositive factual issues that remain in dispute.

**SO ORDERED** this the 17th day of March, 2025.

          /s/Michael P. Mills
          UNITED STATES DISTRICT JUDGE
          NORTHERN DISTRICT OF MISSISSIPPI