**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**ANDY ELLIS, JR.** **PLAINTIFF**

**v.** **No. 1:23-CV-00060-MPM-DAS**

**DAVID ANDREW VECCHIONE, M.D.;**
**MEDTRONIC, INC.; JONATHAN BENNETT;**
**and JOHN DOES 1-10** **DEFENDANTS**

# MEMORANDUM OPINION

This cause comes before the Court on Defendant David Vecchione, M.D.'s Motion to Exclude Certain Opinions of Plaintiff's Expert, Rafal Kedzierski, M.D. [463], Motion to Exclude Certain Opinions and Testimony of Plaintiff's Life Care Planning Expert, Todd Cowen, M.D. [465], and Motion to Exclude Opinions and Testimony of Plaintiff's Economist, Bill Brister, Ph.D. [467]. The Plaintiff, Andy Ellis, Jr., has responded in opposition to each of these motions [480], [478], [476]. The Court has reviewed the record and applicable law and is prepared to rule.

## I. FACTUAL AND PROCEDURAL HISTORY

This is a medical negligence case that concerns the allegedly negligent diagnosis, management, and treatment of Mr. Ellis' spinal epidural abscess ("SEA") following implantation of a Medtronic external spinal cord simulator trial in April of 2022. Post implementation, Mr. Ellis developed severe back pain and various other symptoms, leading him to visit Dr. Vecchione at Specialty Orthopedic Group ("SOG") on April 15, 2022. At this visit, Dr. Vecchione examined the lumbar spine and removed both the adhesive tape and trial leads. Dr. Vecchione did not order any laboratory tests/imaging or issue Mr. Ellis antibiotics.

Subsequently, on April 18, 2022, due to severe back pain, Mr. Ellis presented to North Mississippi Medical Center ("NMMC") emergency department. On April 20, 2022, Mr. Ellis underwent an MRI and was later given antibiotics. Upon reviewing the MRI, radiologist Robert

Becker, M.D., issued a report that identified a fluid collection at the junction of the thoracic and lumbar spine "most concerning for an epidural abscess." On April 21, 2022, Mr. Ellis underwent interventional radiology-guided aspiration of the abscess. After several weeks in the NMMC rehabilitation unit, Mr. Ellis was discharged on May 17, 2022. Mr. Ellis continued to receive physical and occupational therapy and home health services.

On May 31, 2022, Mr. Ellis again presented to NMMC's emergency department, reporting a new onset of urinary incontinence three days prior. The following day, Mr. Ellis underwent another MRI of his lumbar and thoracic spine. Dr. Baker again reviewed the MRI and found no evidence of the prior SEA in either the thoracic spine or lumbar images. Over the last few years, Mr. Ellis has continued to receive treatment from various healthcare providers.

Beginning in July 2022 until present, Mr. Ellis has been treated by neurosurgeon Fereidoon Parsioon, M.D. At Dr. Parsioon's request, Mr. Ellis underwent another MRI on October 18, 2022. Moreover, on February 12, 2024, Dr. Parsioon referred Mr. Ellis to the emergency room for a CT myelogram to rule out the presence of another epidural abscess. Rafal Kedzierski, M.D., the interpreting radiologist, issued a report finding that there was no evidence of an SEA but noted "[m]ild thickening of few lumbar roots, can be seen with chronic arachnoiditis." After reviewing those images with Dr. Kedzierski, Dr. Parsioon opined that arachnoiditis was present on the April 20, 2022 MRI and February 2024 CT scan.

Based on these alleged facts, Mr. Ellis filed his initial Complaint on April 18, 2023, against Dr. Vecchione and numerous other healthcare defendants, alleging that their medical negligence caused him to suffer injuries and damages [1]. Mr. Ellis filed an Amended Complaint on April 28, 2023 [8] and a Second Amended Complaint on July 16, 2025 [297]. As it stands, Dr. Vecchione is the only remaining Defendant in this action.

On May 6, 2025, Mr. Ellis filed his Rule 26 Designation of Expert Witnesses, in which he identified Todd Cowen, M.D. and Bill Brister, Ph. D., among others, as experts. [476] Ex. A. Additionally, on September 10, 2025, Mr. Ellis served his Rebuttal/Supplemental Rule 26 Designation of Expert Witnesses, which included supplemental reports from previously designated medical experts and identified three treating physicians, including Dr. Kedzierski, as experts. [334] Ex. E. Dr. Kedzierski submitted an expert report dated September 9, 2025. On January 30, 2026, Mr. Ellis filed an Amended Rule 26 Designation of Expert Witnesses in which he, again, identified Dr. Cowen as his life care planner, Dr. Brister as his economist, and Dr. Kedzierski as a treating physician. [476] Ex. B. He also attached Dr. Kedzierski's September 9, 2025, report, without revision or addition. *Id.* With Mr. Ellis' designations, Dr. Brister submitted two separate reports. Dr. Brister's Supplemental Report, dated September 9, 2025, is the report which Dr. Brister intends to use in support of his opinions at trial. [476] Ex. C. Additionally, both of Mr. Ellis' designations contained Dr. Cowen's same report.

## II. STANDARD OF LAW

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony before it reaches the jury. 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997). Put differently, "expert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (internal citations omitted).

In *Kumho Tire Co. v. Carmichael*, the Supreme Court extended the *Daubert* gatekeeping obligation to all forms of expert testimony, not merely scientific testimony. 526 U.S. 137, 147-50

(1999). The foundational rule governing motions to exclude expert testimony is Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court's analysis as to the reliability of an expert's proposed testimony "must be solely on the principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "To be reliable, expert testimony must 'be grounded in the methods and procedures of science and…be more than unsupported speculation or subjective belief.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019) (internal citations omitted). Therefore, the district court must conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93 (1993).

*Daubert* set forth a non-exclusive checklist for trial courts to use in determining the reliability of expert testimony. These factors include: (1) whether the expert's technique or theory has been tested; (2) whether the technique or theory has been subjected to peer-review and publication; (3) the known or potential rate of error applicable to the technique or theory; (4) the existence of standards and controls applicable to the technique or theory; and (5) whether the technique or theory is generally accepted in the scientific community. *Daubert*, 509 U.S. 579 (1993).

The proponent bears the burden of demonstrating, by a preponderance of the evidence, that the proposed testimony satisfies Rule 702's admissibility requirements. *United States v. Fullwood*,

342 F.3d 409, 412 (5th Cir. 2003); *see also*, *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The Court must examine the expert's principles and methodology, not simply the expert's ultimate conclusion. *Daubert*, 509 U.S. at 595. The Court may exclude an opinion when the expert offers only his own assurance that the conclusion follows, or when too great an analytical gap separates the underlying data from the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (internal citations omitted).

It must be emphasized that the *Daubert* inquiry into "reliability" is separate and distinct from the ultimate issue for the jury's consideration, i.e. whether plaintiffs have submitted sufficiently "reliable" proof to permit them to satisfy their burden of proof in a particular case. There is sufficient similarity between the *Daubert* inquiry and a jury's inquiry that a real danger exists that a court will conflate the two and, thereby, improperly assume the factfinder role which is appropriately reserved for the jury.

Juries decide, on a daily basis, that a particular litigant's proof (including his expert testimony) on a specific issue is not "reliable" in the sense of being persuasive and worthy of credence. The fact that a jury might ultimately decide that a particular expert's testimony is unreliable does not mean, however, that a court acted improperly in permitting the jury to consider that testimony in the first place. The court's proper inquiry in the *Daubert* context is whether the expert's testimony is so lacking in reliability as to preclude that expert from even presenting his testimony to the jury. This is, very clearly, a different issue than the ultimate issue for the jury, and the court must be careful not to confuse the two.

In that regard, *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078

(5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Thus, rejection of expert testimony is the exception rather than the rule. Not every factual challenge warrants exclusion. When facts are genuinely disputed and an expert relies on one plausible version of the facts, the court should not exclude the opinion simply because it credits the other version. Fed. R. Evid. 702. Such disputes go to weight, not admissibility. *Id.*

While exercising its role as a gatekeeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits. *Pipitone*, 288 F.3d at 250. "Courts should not be lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its admissibility. As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Dockery v. Hall*, No. 3:13-CV-326-WHB-JCG, 2018 WL 11424779 at *2 (S.D. Miss. 2018) (quoting *Gen. Elec. Cap. Bus. Asset Funding Corp. v. S.A.S.E. Mil. Ltd.*, 2004 WL 5495590 (W.D. Tex. 2004)).

## III. ANALYSIS

Before the Court are three motions filed by Dr. Vecchione seeking to exclude or strike evidence: (1) Motion to Exclude Certain Opinions of Dr. Kedzierski [463]; (2) Motion to Exclude Certain Opinions and Testimony of Dr. Cowen [456]; and (3) Motion to Exclude Opinions and Testimony of Dr. Brister [467]. For the sake of efficiency and conciseness, the Court will address each of Dr. Vecchione's motions in turn.

### A. Dr. Vecchione's Motion to Exclude Certain Opinions of Rafal Kedzierski, M.D.

First, the Court will consider Dr. Vecchione's Motion to Exclude Certain Opinions of Dr. Kedzierski [463]. In this motion, Dr. Vecchione blessed the Court with a flurry of objections: (1)

in his March 26, 2026 deposition, Dr. Kedzierski admitted he was not qualified to diagnose Mr. Ellis with "chronic arachnoiditis," (2) he lacked sufficient facts or data to attribute the "mild" arachnoiditis findings he described in February 2024 to Mr. Ellis' spinal epidural abscess detected nearly two years prior, (3) he expressed multiple opinions that he could not state to a reasonable degree of medical probability, and (4) he rendered other opinions that were not disclosed in his expert report. Finally, Dr. Vecchione argues that all of these opinions are improper under Fed. R. Evid. 702 and should be excluded.

As an initial matter, the Court provides the pertinent parts of Dr. Kedzierski's September 9, 2025 expert report that are currently at issue:

> I have independently reviewed the MRI obtained at North Mississippi Medical Center on April 20, 2022. The MRI report reads as follows: "Interval development of an extradural multiloculated peripherally enhancing fluid collection at the thoracolumbar junction resulting in moderate thecal sac stenosis of *5* mm and displacement of the conus and upper cauda equina. The appearance is most concerning for an epidural abscess." I agree with this interpretation. I would also note thickening of lumbar roots and arachnoiditis were present on this MRI.
>
> Mr. Ellis underwent a CT thoracic spine after myelogram on February 12, 2024, which I interpreted. I noted the following:
>
> 1. Successful thoracic myelogram, with contrast well distributed throughout thecal sac, contrast extends throughout thecal sac with no areas of extra-axial exclusion to suggest presence of epidural abscess or epidural hematoma.
> 2. Presence of thoracic spine stimulators. Presence of baclofen pump lead terminating within thecal sac at Tl l/Tl2.
> 3. Mild thickening of few lumbar roots, can be seen with chronic arachnoiditis.
>
> It is my opinion that Mr. Ellis' thickening of lumbar roots and chronic arachnoiditis were more likely than not caused by the spinal epidural abscess and associated inflammation. Arachnoiditis refers to the inflammation of the arachnoid membrane, one of the three meninges that envelop the spinal cord and nerve roots. It is a significant sequela of spinal epidural abscess and often results in chronic pain, neurological deficits, and functional impairment.

> The above opinions are given to a reasonable degree of medical probability, based on my education, training, and experience and information furnished to me in this case, as well as my personal care and treatment of Mr. Ellis. I reserve the right to amend or supplement my opinions as set forth in this report based on the receipt of new or additional information.

[463] Ex. A.

1. *Dr. Kedzierski's Opinion Diagnosing Mr. Ellis with "Chronic Arachnoiditis"*

Dr. Vecchione argues that Dr. Kedzierski's opinion as to the presence of "chronic arachnoiditis" set forth in his September 9, 2025 report fails to satisfy the basic requirements of Rule 702 and must be excluded. As recited above, Dr. Kedzierski states in his September 9, 2025 report, "It is my opinion that Mr. Ellis' thickening of lumbar roots and chronic arachnoiditis were more likely than not caused by the spinal epidural abscess and associated inflammation." However, Dr. Vecchione points out that Dr. Kedzierski testified that chronic arachnoiditis is a clinical diagnosis, not a radiological diagnosis, that he had never made the diagnosis of chronic arachnoiditis, that he is not an expert as to the clinical findings associated with chronic arachnoiditis, has no knowledge of Mr. Ellis' clinical status, and that he would defer to others to opine as to the diagnosis of chronic arachnoiditis. For those reasons, Dr. Vecchione argues that Dr. Kedzierski is not qualified to diagnose or testify to "chronic arachnoiditis." The Court agrees to a certain extent.

The Court finds that Dr. Kedzierski is a board-certified radiologist, has reviewed approximately 40,000 MRI studies, and performed and interpreted approximately 100 MRIs and ten CT myelograms where he identified findings of arachnoiditis. Additionally, in this case, Dr. Kedzierski personally interpreted the February 2024 CT myelogram, in which he identified findings consistent with chronic arachnoiditis. Thus, Dr. Kedzierski is a qualified neuroradiologist with extensive experience and training in that regard.

Moreover, the Court argues that radiologists are not qualified to make clinical diagnoses; however, the role of a radiologist is to identify imaging findings and opine as to how they are inconsistent. In his motion, Dr. Vecchione makes it clear that he is not contesting Dr. Kedzierski's ability to testify to his interpretation as a treating radiologist that the February 2024 CT includes "[m]ild thickening of few lumbar roots, can be seen with chronic arachnoiditis." Therefore, the Court finds that Dr. Kedzierski, as a neuroradiologist, is qualified to opine that Mr. Ellis' imaging findings are *consistent* with arachnoiditis, and his expert opinion given at trial should be limited accordingly. However, Dr. Kedzierski is precluded from offering testimony diagnosing Mr. Ellis with chronic arachnoiditis at trial.

2. *Dr. Kedzierski's Causation Opinion*

Additionally, Dr. Vecchione argues that Dr. Kedzierski lacks sufficient facts or data to opine that Mr. Ellis' chronic arachnoiditis was caused by the SEA. In Mr. Ellis' response, he concedes that Dr. Kedzierski will not testify that the SEA caused Mr. Ellis' arachnoiditis. Accordingly, the Court finds that Dr. Kedzierski's causation opinion should be excluded.

3. *Dr. Kedzierski's Testimony Regarding a "Fourth Category" of Arachnoiditis Imaging Findings*

Additionally, Dr. Vecchione argues that Dr. Kedzierski's opinion regarding a fourth classification of imaging findings associated with arachnoiditis should be excluded. The Court agrees and finds that Dr. Kedzierski's opinion regarding the fourth classification of arachnoiditis imaging findings should be excluded on two independent grounds: (1) the opinion fails the reliability requirements of Fed. R. Evid. Rule 702 and *Daubert*, and (2) the opinion was not disclosed in Dr. Kedzierski's September 9, 2025 report as required by Federal Rule of Civil Procedure 26(a)(2)(B).

In his deposition, Dr. Kedzierski testified that there are three classifications of radiology findings associated with adhesive arachnoiditis, referred to as the Delamarter classifications, which he agreed are "well accepted within the field of radiology." [463] Ex. B at 67:11-25; 68:1-4. Dr. Kedzierski also testified that "newer literature" attempts to identify a fourth classification of imaging findings associated with arachnoiditis. [463] Ex. B at 68:5-15. However, Dr. Kedzierski acknowledged that there is no generally accepted definition of the fourth classification, because it is still in the developmental stages. [463] Ex. B at 145:25; 146: 1-3; 78:5-13. For those reasons, Dr. Vecchione argues that Dr. Kedzierski's opinion regarding the "fourth category" of arachnoiditis imaging findings should be excluded because it cannot assist the trier of fact to understand the evidence or to determine a fact in issue, and the testimony lacks sufficient facts or data.

In applying Rule 702 factors, the Court finds that Dr. Kedzierski's opinion regarding a "fourth category" of arachnoiditis imaging findings is unreliable. Ironically, the most compelling evidence against admissibility comes from Dr. Kedzierski's own deposition testimony, in which he acknowledged that there is no generally accepted definition of the fourth classification because it is still in the developmental stages, and that it "is not yet generally accepted in the medical field as being a definitive classification of arachnoiditis…." [463] Ex. B at 78:5-13; 143:6-12. *Daubert* makes it clear that "general acceptance" is not a necessary precondition to the admissibility of scientific evidence. *Daubert*, 509 U.S. 579. However, "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may be properly viewed with skepticism." *Id.* at 594 (internal citations and quotations omitted). Thus, Dr. Kedzierski's own acknowledgment that the "fourth classification" is not generally accepted weighs against the Rule 702's reliability requirement.

Moreover, Mr. Ellis' argument that the existence of the emerging classification in peer-reviewed literature satisfies the reliability threshold has some merit as a general proposition. Under *Daubert*, whether a theory or technique has been subjected to peer review and publication is a relevant consideration in assessing the reliability of an expert's methodology, although it is not dispositive. *Id.* at 593-94. Here, however, the record does not support treating the existence of such literature as independently establishing reliability. Dr. Kedzierski himself characterized the cited works as "newer literature" that merely "attempts to identify" a fourth classification, and he acknowledged that the field has not reached a generally accepted definition of that classification. Those concessions substantially undermine any contention that the peer-review factor, standing alone, establishes the reliability of the methodology employed in this case.

Furthermore, Mr. Ellis' contention that Dr. Kedzierski's reference to the developing literature on the fourth category is merely supplemental and contextual, rather than a primary opinion, is also unavailing under the reliability analysis. If the testimony is offered to assist the trier of fact in understanding why imaging findings that deviate from the typical presentation are nevertheless "diagnostically significant," the testimony is not merely explanatory background. Rather, it conveys an expert opinion based on the application of specialized knowledge and therefore must satisfy the requirements of Rule 702 and *Daubert*, regardless of how the testimony is characterized.

Additionally, Dr. Kedzierski's fourth classification opinion should be excluded because it was not included in his September 5, 2025 expert report and was only first mentioned in his deposition. Pursuant to Rule 26(a)(2), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P 26(a)(2)(A). That disclosure "must be accompanied by a written report…if the

witness is one retained or specially employed to provide expert testimony in the case…." Fed. R. Civ. P 26(a)(2)(B). The report, in turn, must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P 26(a)(2)(B)(i). Additionally, Rule 37(c)(1), states that if a party fails to provide information as required by Rule 26(a) or (e), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, Mr. Ellis concedes that the fourth category opinion was not in his September 9, 2025 report but advanced no justification for this omission. This is prejudicial to Dr. Vecchione because it does not allow "the opposing party to have all the relevant information in a timely fashion so that the opposing party may prepare to cross-examine the expert during his or her deposition." *Gardley-Starks v. Pfizer, Inc.*, No. 4:10CV099-P-S, 2013 WL 323333 at *1 (N.D. Miss. Jan. 28, 2013). Thus, Dr. Kedzierski's opinion regarding the "fourth classification" should be excluded pursuant to Rules 26 and 37.

However, the Court finds that Dr. Kedzierski is permitted to give primary opinions grounded in the well-accepted Delamarter Types 1, 2, and 3 classification system, which remain independently supported by sufficient facts, reliable and accepted methodology, and are contained within the expert's timely disclosed report. Thus, Dr. Kedzierski's trial testimony should be limited to the scope of his September 9, 2025 expert report.

4. *Dr. Kedzierski's Opinions Regarding Clumping, the October 22, 2022 MRI, and the Empty Thecal Sac Sign*

In his motion, Dr. Vecchione also seeks to exclude Dr. Kedzierski's opinions regarding (1) the finding of nerve root "clumping" on the April 20, 2022 MRI; (2) the October 18, 2022 MRI;

and (3) his equivocal observation of the "empty thecal sac sign." The Court addresses each of these in turn.

a. "Clumping" on April 20, 2022 MRI

In Dr. Kedzierski's September 9, 2025 report, regarding the April 20, 2022 MRI, he stated "I would also note thickening of lumbar roots and arachnoiditis were present on this MRI." [463] Ex. A. In his deposition, however, Dr. Kedzierski states that "thickening and clumping can go together," and that on Series 17, Image No. 17 he observed thickening and clumping of nerve roots. [463] Ex. B at 101:9-23. Moreover, Dr. Kedzierski confirmed that "thickening" and "clumping" are separate radiographic findings and that he made no reference to clumping in his September 9, 2025 report. [463] Ex. B at 92:9-15; 102:10-12. Accordingly, Dr. Vecchione argues that because experts are held to the opinions disclosed in their reports, Dr. Kedzierski should be prohibited from offering any opinion at the trial of this case that the April 20, 2022 MRI reflects "clumping."

Again, Rule 26(a)(2)(B) is applicable. Additionally, Rule 26(e) imposes a continuing duty to supplement disclosures and responses in a timely manner "if the party learns that in some material respect the disclosure or response is incomplete or incorrect…." Fed. R. Civ. P 26(e). Courts demand strict compliance with Rule 26 because its "basic purpose [is] preventing prejudice and surprise." *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994). Rule 26 allows the defendant to prepare properly for evidence disclosed by the plaintiff.

Here, the Court finds that "clumping" constitutes a new opinion, rather than merely a description of the same pathological phenomena as "thickening of lumbar roots and arachnoiditis" using different terminology. This is evidenced by the fact that Dr. Kedzierski made no reference to "clumping" in his expert report and acknowledged in his deposition that "thickening" and "clumping" are separate radiographic findings. Thus, Mr. Ellis' argument that the report's reference

to "thickening…and arachnoiditis" was intended to encompass the constellation of findings Dr. Kedzierski identified is unpersuasive. Accordingly, pursuant to Rule 37(c)(1), exclusion is the presumptive sanction unless Mr. Ellis demonstrates the failure was substantially justified or harmless.

In this case, Mr. Ellis failed to offer a substantial justification for omitting his opinion regarding "clumping" from his September 9, 2025 report. More significantly, the Court had specifically directed the parties to "submit amended expert reports that directly address the arachnoiditis issues, their significance, and their relationship to Mr. Ellis' injuries." [393]. However, instead of seizing this opportunity, Dr. Kedzierski did not supplement his September 9, 2025 report, but rather, resubmitted it on January 20, 2026 without revision or amendment. This is not a case of inadvertent omission or newly discovered evidence; it is a failure to exercise an express court-granted opportunity to cure. The Court acknowledges that Dr. Kedzierski's "clumping" opinion may well be relevant to the arachnoiditis causation theory; however, the importance of a finding does not excuse compliance with disclosure obligations.

With regard to prejudice, the Court acknowledges Mr. Ellis' argument that there was no unfair surprise or prejudice because Dr. Kedzierski's "clumping" testimony emerged during deposition taken approximately six months before trial, and Dr. Vecchione had the opportunity, and exercised that opportunity, to explore the finding extensively on cross-examination. Ordinarily, where the issue is merely a gap or deficiency in an expert disclosure, the resulting prejudice may be considered harmless. However, the circumstances in this case present a unique situation. The Court finds that, after ordering the parties to supplement their expert reports on the issue of arachnoiditis, Dr. Kedzierski's failure to do so reasonably led Dr. Vecchione to conclude that Dr. Kedzierski would not offer an opinion regarding "clumping" at trial.

That said, the Court finds that Dr. Kedzierski should be excluded from offering opinions regarding "clumping" at trial, because it is a distinct finding that required supplemental disclosure. However, Dr. Kedzierski is still permitted to describe his observations on the radiological images that were properly and timely disclosed in his expert report.

b. October 18, 2022 MRI

In Dr. Kedzierski's September 9, 2025 report, he referenced both Mr. Ellis' April 20, 2022 MRI and the February 12, 2024 post-myelogram CT. However, in his deposition, Dr. Kedzierski stated that he had reviewed the October 18, 2022 MRI, which was not mentioned in his expert report, and that the images showed "possible early nerve root thickening reappearing again." [463] Ex. B at 135:5-14. Dr. Vecchione argues that Dr. Kedzierski's opinion as to potential "nerve root thickening" on the October 18, 2022 MRI should be excluded because it was not timely disclosed in his export report and he could only state his opinion in terms of possibilities, not probabilities.

In his response, Mr. Ellis conceded that Dr. Kedzierski's failure to reference the October 18, 2022 MRI in his report is "a legitimate basis for limiting his opinions at trial to the two studies identified in his report." [481]. The Court agrees. Additionally, Mr. Ellis represented that he "does not oppose a limitation that confines Dr. Kedzierski's affirmative case-in-chief opinion to the April 20, 2022 MRI and February 12, 2024 CT myelogram." *Id.* In light of that representation, the Court limits Dr. Kedzierski's affirmative case-in-chief opinion to the April 20, 2022 MRI and February 12, 2024 CT myelogram. Accordingly, the Court finds it unnecessary to address Dr. Vecchione's argument regarding Dr. Kedzierski's stating his opinion in terms of possibilities.

The Court will also address Mr. Ellis' argument that Dr. Kedzierski should be permitted to testify on cross-examination or redirect regarding the imaging progression, including the October

2022 study, to the extent such testimony is responsive and used to rehabilitate or contextualize his primary opinions.

In *United States v. Delk*, the Fifth Circuit stated "it is well settled that the purpose of rebuttal testimony is to explain, repel, counteract, or disprove the evidence of the Adverse party and if the defendant opens the door to the line of testimony, he cannot successfully object to the prosecution accepting the challenge and attempting to rebut the proposition asserted." 586 F.2d 513, 516 (5th Cir. 1978) (internal citations and quotations omitted). Given the circumstances, the Court elects to impose a limited exclusion tied to Dr. Kedzierski's case-in-chief, as opposed to a blanket pretrial exclusion of all Dr. Kedzierski's October 2022 MRI testimony.

Accordingly, Dr. Kedzierski's October 2022 MRI opinions shall be excluded from Mr. Ellis' direct examination; however, the Court retains discretion to permit redirect examination touching on the October 2022 MRI if, and only if, Dr. Vecchione opens the door by cross-examining Dr. Kedzierski about it. However, the Court makes it very clear that Mr. Ellis may not use redirect as a backdoor avenue to present October 2022 MRI opinion as substantive case-in-chief evidence.

c. Empty Thecal Sac Sign

Finally, Dr. Vecchione argues that Dr. Kedzierski's opinion as to an "equivocal" empty thecal sac sign should be excluded on two grounds: (1) Dr. Kedzierski made no reference to any such finding in his expert report and (2) Dr. Kedzierski cannot and did not state his opinion with respect to an empty thecal sac sign in terms of probabilities as opposed to possibilities. The Court agrees.

Dr. Kedzierski, in his deposition, states "[y]ou can question whether this is an empty sac sign or early empty sac sign on these images" regarding the April 20, 2022 MRI. [463] Ex. B at

100:7-25. Again, Dr. Kedzierski acknowledges that this opinion was not referenced in his report. *Id.* The Court has discussed at length above Mr. Ellis' consequences for not ensuring that Dr. Kedzierski's report contains the opinions he wishes to present at trial.

The second and equally dispositive basis for exclusion is Dr. Kedzierski's inability to state his opinion regarding the empty thecal sac sign to a reasonable degree of medical probability. At his deposition, when Dr. Kedzierski was asked "are you able to state to a reasonable degree of medical probability that what you are showing me is an empty thecal sac?" he replied, "I can say equivocal empty sac sign." [463] Ex. B at 101:1-4. Dr. Kedzierski's use of the term "equivocal" shows uncertainty, not probability. Thus, the Court finds that Dr. Kedzierski's inability to state his empty thecal sac opinion to a reasonable degree of medical probability amounts to mere speculation.

Notably, Mr. Ellis does not oppose a limitation preventing Dr. Kedzierski from affirmatively opining that a Type 2 empty thecal sac sign is present on the April 2022 MRI to a reasonable degree of medical probability. However, Mr. Ellis argues that Dr. Kedzierski should be permitted to describe what he observed on the images, including the appearance of nerve root displacement that is "consistent with" or raises the possibility of Type 2 findings, as part of his overall description of what the images showed. The Court disagrees. Mr. Ellis' limitation does not cure the issue that Dr. Kedzierski cannot state his opinion in probabilities and allowing Dr. Kedzierski to frame his observation as "consistent with" or as raising a "possibility" to the jury would allow him to circumvent the probability standard through semantic reformulation. Accordingly, Dr. Kedzierski's opinion regarding an "equivocal" empty thecal sac sign in the April 2022 MRI shall be excluded.

**B. Dr. Vecchione's Motion to Exclude Certain Opinions & Testimony of Todd Cowen, M.D.**

The Court will now address Dr. Vecchione's Motion to Exclude certain opinions and testimony of Todd Cowen, M.D. [465]. Mr. Ellis retained Dr. Cowen to prepare a Catastrophic Life Care Plan ("LCP") quantifying the reasonable future costs of Mr. Ellis' medical and life care needs and designated him as an expert in physical medicine and rehabilitation, pain medicine, and life care planning. Dr. Cowen submitted a LCP for Mr. Ellis totaling $5,816,158.82.

In Dr. Vecchione's motion, he seeks to exclude five categories of Dr. Cowen's LCP, including: (1) cost allocations for medications Mr. Ellis was taking prior to the alleged injuries; (2) opinions on the cost of anticipated future medications; (3) opinions concerning lost wages, earning capacity, and ability to engage in avocational or recreational activities; (4) opinions regarding and cost allocations for household management expenses; and (5) cost allocations for home modifications. The Court will address each category in turn.

1. *Dr. Cowen's Cost Allocations for Medications Mr. Ellis was Taking Prior to the Alleged Injuries*

Dr. Vecchione argues that Dr. Cowen's LCP lacks the requisite reliability and relevance under Rule 702 sufficient to assess damages for medical conditions that pre-date and are unrelated to Mr. Ellis' alleged injuries in this case. Dr. Vecchione seeks to exclude Dr. Cowen's testimony and allocation for four medications: Lyrica, Prozac, Percocet, and Ultram.

Dr. Vecchione relies on the Court's rationale in *Watkins v. New Palace Casino, LLC*, No. 1:13CV224-HSO-RHW, 2014 WL 10100196 (S.D. Miss. Nov. 6, 2014). In *Watkins*, the court excluded portions of a life care plan prepared by a psychologist covering medications for pain relief, depression, and sleep aid. No. 1:13CV224-HSO-RHW, 2014 WL 10100196 (S.D. Miss. Nov. 6, 2014). The court excluded those allocations because the plaintiff had been taking the same or similar medications before the fall, and the medical expert's testimony did not reliably attribute

the projected medication needs to the incident. *Id.* The court specifically found that "plaintiffs have not demonstrated that Dr. Thomas's opinion regarding the need for these particular medications is based on sufficient facts or data or that his testimony on this point is the product of reliable principles and methods." *Id.* at *8. Additionally, the life care planner admitted he "did not know how to carve out the preexisting pain meds," and the consulting medical expert confirmed the patient would continue needing essentially the same medications he took before the fall. *Id.* at *7.

Regarding Lyrica, the Court finds that Dr. Cowen's testimony and allocation of funding for Lyrica should be excluded based on Mr. Ellis' acknowledgement and concession that Mr. Ellis cannot represent to this Court with the confidence that *Daubert* requires that the projected Lyrica costs are attributable solely to Mr. Ellis' post-injury condition rather than a continuation of pre-existing use.

Regarding Prozac, Dr. Cowen, during his deposition, acknowledged that a record he had not reviewed reflects that Mr. Ellis had been diagnosed with mild depression in 2016 and was taking amitriptyline. [478] Ex. D at 172:19-25; 173:1-24 & [465] Ex. C at 174:1-15. Dr. Cowen also conceded that he had no knowledge as to the length of time Mr. Ellis continued to take that medication. [465] Ex. C at 174:1-25. Dr. Vecchione argues that the Court should preclude the LPC's allocation for Prozac because it is not based on sufficient facts or data.

In response, Mr. Ellis argues that the psychological impact of Mr. Ellis' spinal injuries constitute an independent clinical basis for antidepressant therapy regardless of any prior mild depressive history and that this is a factual question for the jury. Mr. Ellis' argument simply misses the mark. Although the Court agrees that Mr. Ellis' spinal injuries could act as an independent basis for antidepressant medication, the issue lies in the fact that Mr. Ellis has failed to identify a patient-specific causation analysis by Dr. Cowen separating pre-existing medication needs from those

allegedly caused by the SEA-related injuries. Dr. Cowen admitted that he did not attempt to parse out the medications Mr. Ellis was taking for preexisting conditions when assigning costs for medications in the LCP. [465] Ex. C at 142:25-143:1-9.

Additionally, Dr. Cowen included an allocation for Percocet and Ultram (tramadol hydrochloride), which are both opioid pain medications. In his deposition, Dr. Cowen acknowledges that Mr. Ellis used Norco, an opioid pain medication, prior to the SEA and alleged injuries and admits that he is unaware of whether Mr. Ellis used Ultram prior to his alleged injuries in 2022. [465] Ex. C at 143:20-25; 144:1-5. However, Dr. Cowen admitted that he would defer to Mr. Ellis' pharmacy records, and these records do reflect that Mr. Ellis filled tramadol in 2016. *Id.* at 144:6-12; Ex. 12 in Ex. C.

Dr. Vecchione argues that because Mr. Ellis used similar opioid pain medications prior to his alleged injuries, and Dr. Cowen did not reliably attribute Mr. Ellis' need for Percocet and Ultram to the incident at issue, the Court should preclude the LCP's allocation of those medications. Mr. Ellis argues that opioid pain management after a spinal cord injury is not equivalent to the pain management Mr. Ellis received for a musculoskeletal injury, and whether certain pain medications are now required to manage Mr. Ellis' pain post-injury is a credibility issue for the jury. Again, the Court finds that Mr. Ellis' argument falls short. Ultimately, Mr. Ellis has failed to identify a patient-specific causation analysis by Dr. Cowen separating pre-existing medication needs from those allegedly caused by the SEA-related injuries. Thus, Dr. Cowen's medication allocations for these medications are not based on sufficient facts and a reliable application of his methodology to Mr. Ellis' medication history and should be excluded.

2. *Dr. Cowen's Opinions on the Cost of Anticipated Future Medications*

In regard to determining Mr. Ellis' future medication costs, Dr. Cowen's methodology consisted of surveying six Tupelo-area pharmacies, obtaining the generic pricing and brand-name pricing for each medication, and averaging all six prices. Additionally, Dr. Cowen's approach is consistent with the methodology established by the American Academy of Physician Life Care Planners, the professional organization whose standards govern certified life care planners. [478] Ex. D at 45:7-16; 88:8-17. Dr. Cowen testified that this methodology has been subjected to peer review, accepted for continuing medical education credits, and broadly utilized within the life care planning profession. [478] Ex. D at 136:2-16. Dr. Cowen also testified that he does not have discretion to deviate from methodology supported by the American Academy of Physician Life Care Planners; however, he stated he was "sure some life care planners" do not use this methodology. [465] Ex. C at 132:15-139:11. Dr. Vecchione argues that Dr. Cowen's opinions as to Mr. Ellis' future medication costs are the product of an unreliable methodology, and do not fit the facts, and likewise must be excluded.

In *Gene Harney, et al.*, the court stated that the defendant's disagreement with the life care planner's approach of averaging the costs of brand-name and generic medications "can be addressed through cross-examination…and the presentation of countervailing testimony because they go to the weight, not the admissibility of his testimony." *Gene Harney, et al. v. Maersk A/S, in personam, et al.*, No. 4:25-CV-00392, 2026 WL 2549174 at *12 (S.D. Tex. July 15, 2026) (internal quotations and citations omitted). Rule 702(c) requires that the expert's testimony is "the product of reliable principles and methods." Fed. R. Evid. 702. Dr. Cowen has met this standard. The fact that some life care planners may deviate from this methodology does not render

it unreliable. Thus, methodological disagreements among experts are the province of cross-examination.

However, the more substantial issue is whether Dr. Cowen reliably applied his methodology to the facts of this case. Dr. Cowen's reasoning for declining to price medications at generic-only rates was that medications evolve over time and Mr. Ellis' future pharmaceutical needs may include brand-name only medications not currently available in generic form. Notably, however, Dr. Cowen concedes that every medication Mr. Ellis currently takes and every medication for which he allocated costs in the life care plan already has a generic equivalent. [465] Ex. C at 133:14-134:13. The Court acknowledges that Dr. Cowen's premise is not anchored to any plaintiff-specific evidence, any identified medication, or any credible clinical projection. Thus, although the Court finds that Dr. Cowen's averaging methodology is reliable, applying it here based solely on a generalized and hypothetical scenario creates an analytical gap that should be scrutinized under Rule 702(d).

By his own admission, Dr. Cowen did not review Mr. Ellis' pharmacy records and acknowledged that only probable future expenses should be included in a life care plan. "Even if the expert is qualified and the basis of [his or] her opinion is reliable, the underlying methodology must have been correctly applied to the case's particular facts for [his or] her testimony to be relevant." *Robinson v. Ethicon, Inc.*, 580 F. Supp. 3d 452, 457 (S.D. Tex. 2022) (internal citations omitted).

The Court declines to exclude Dr. Cowen's medication cost opinions in their entirety, because his methodology itself is sufficiently reliable, and the challenge to it is most properly addressed through cross-examination and competing expert testimony. Additionally, Dr. Vecchione's arguments regarding Dr. Cowen's failure to review pharmacy records and brand-

substitution data go to the weight and credibility of his testimony, which should be properly addressed at trial. However, the Court also elects to limit Dr. Cowen's opinion, precluding him from justifying the brand-name pricing component solely on the basis of hypothetical future brand-only medications, given that the current medications listed in the life care plan have a generic equivalent and no plaintiff-specific evidence supports the brand-name premium.

3. *Dr. Cowen's Opinions Concerning Lost Wages, Earning Capacity, & Ability to Engage in Avocational Activities*

Dr. Vecchione argues that Dr. Cowen's LCP does not allocate damages for lost wages or opine that Mr. Ellis is unable to engage in certain work because of his alleged injuries; therefore, he should be precluded from offering such opinions at trial. This issue is largely moot because Mr. Ellis concedes that Dr. Cowen has not been designated to offer vocational opinions, has produced no such opinion, and will not offer such opinions at trial. Moreover, Mr. Ellis acknowledges that Dr. Cowen does not offer an independent lost-wages opinion or a vocational assessment, and the LCP contains no line item for lost wages or earning capacity.

Moreover, regarding Mr. Ellis' current work-capacity, Dr. Cowen admitted in his deposition that he did not analyze Mr. Ellis' ability to work, did not know what tasks were involved in Mr. Ellis' livestock business, and did not assess whether Mr. Ellis could perform work not involving the use of his legs. [465] Ex. C at 184:5-185:1. Pursuant to Rule 702, an opinion that is not based on sufficient facts or data and does not reflect a reliable application of methodology to the specific facts fails the admissibility standard. Fed. R. Evid. 702.

In the LCP, Dr. Cowen states that Mr. Ellis "is unable to do any of this [work] since November of 2020." [479] at p. 11. In his response, Mr. Ellis argues that this is a clinical observation about functional limitations arising from his injuries, not a damages calculation, and contends that Dr. Cowen should be permitted to offer this observation. However, the Court agrees

with Dr. Vecchione's argument that this constitutes a work capacity opinion, rather than a clinical observation. Thus, Dr. Cowen is precluded from offering opinions on lost wages, earning capacity, vocational disability, or inability to perform work; however, this limitation does not prevent Dr. Cowen from testifying about medical restrictions or physical limitations within his expertise if otherwise admissible.

With regard to Mr. Ellis' avocational activities, Dr. Cowen opined that Mr. Ellis' hobbies formerly included "hunting, swimming, horses, fishing, and hiking," but that he now only watches TV. However, Dr. Cowen admitted that he presumed this diminishment without further investigation. [465] Ex. C at 203:1-8. The Court reiterates that under Rule 702, an opinion that is not grounded in sufficient facts or data, and that is not the product of reliable methodology, is inadmissible. Fed. R. Evid. 702.

That said, Mr. Ellis represents that Dr. Cowen assigned no monetary value to any diminished recreational capacity, characterizing it instead as a functional status observation. On that basis, Mr. Ellis argues that Dr. Vecchione's motion to exclude opinions on avocational activities is therefore largely moot. Regardless of the monetary value, or lack thereof, the Court precludes Dr. Cowen from offering any opinion concerning a loss of avocational capacity. Dr. Cowen failed to properly investigate whether Mr. Ellis' ability to engage in recreational activities was diminished before the alleged injuries and, if so, whether that ability was further diminished afterward. Instead, Dr. Cowen simply assumed Mr. Ellis' recreational capacity was diminished before the alleged injuries and further diminished afterward.

4. *Dr. Cowen's Opinions Regarding & Cost Allocations for Household Management Expenses*

In the LCP, Dr. Cowen allocated $108,000 in damages for house cleaning, which is broadly defined to include household management. Dr. Vecchione argues that Dr. Cowen's opinions

concerning household management expenses should be excluded as unreliable, speculative, and unsupported by the evidence. The Court acknowledges that the record and nature of Mr. Ellis' injuries do support allocation for household management expenses. At this time, the Court presumes that this figure ($108,000), which seems reasonable, will be substantiated at trial. Thus, the Court denies Dr. Vecchione's request to exclude Dr. Cowen's opinions regarding costs allocated for household management expenses, subject to proof at trial.

5. *Dr. Cowen's Cost Allocations for Home Modifications*

In the LCP, Dr. Cowen allocated $100,000 for home modification. In his deposition, when explaining how he determined the allocation, Dr. Cowen stated that in the absence of a contractor's estimate, life care planners often rely on the Department of Veterans Affairs' grant allowance for the cost of making a home accessible. [478] Ex. D at 193:3-12. Mr. Ellis states that the VA's $100,000 figure represents a professionally validated, government-derived estimate of the cost to bring a home into compliance with the accessibility needs of a wheelchair-bound individual and that using a government benchmark as a cost-estimate is a reliable methodology.

Here, Mr. Ellis testified that his home already has sufficiently wide doorways, that he can currently access all areas of his home by wheelchair, aside from a few storage areas, and ramps have been installed, and handrails have been installed in the bathroom. [465] Ex. D at 75:16-25-76:3 & Ex. F at 239:11-240:22. Dr. Cowen himself acknowledged that the modifications Mr. Ellis had made included rails in the bathroom, one widened door, and portable ramps. [465] Ex. C at 190:23-192:22. Dr. Cowen even admitted he never determined which areas of Mr. Ellis' home were inaccessible, never identified what specific modifications would be needed, never determined how much any specific modification would cost, and never discussed with Mr. Ellis whether there are areas of the home he cannot access. *Id.* Dr. Cowen's assumption that the home requires

extensive modification simply because "not much has been done" ignores Mr. Ellis' own account of the accessibility of his home. *Id.*

Even accepting that life care planners may sometimes reference VA housing grant data as a professional benchmark, Dr. Cowen's methodology as actually applied to this case is fatally flawed. The VA grant maximum represents a ceiling amount available to eligible veterans for making a home fully accessible. It does not represent a determination that any particular plaintiff's home requires that level of modification, nor that the cost to this plaintiff of whatever modifications are needed equals that ceiling figure. Dr. Cowen used the full $100,000 VA grant maximum as a single global allowance without: (1) identifying any specific modification needed in Mr. Ellis' home; (2) determining which areas, if any, remain inaccessible; (3) calculating or even estimating what any individual modification would cost; or (4) adding up specific allowances for necessary modifications. Thus, Dr. Cowen's allocation for home modification fails to meet the reliability requirement of Rule 702 and should be excluded.

### C. Dr. Vecchione's Motion to Exclude Opinions & Testimony of Bill Brister, Ph.D.

Lastly, the Court will address Dr. Vecchione's Motion to Exclude opinions and testimony of Mr. Ellis' expert economist, Dr. Brister [467]. In this case, Mr. Ellis seeks both economic and non-economic damages, including past and future medical expenses, loss of past and future income, and loss of household services. Accordingly, Mr. Ellis designated Dr. Brister as an expert in the fields of finance and economics. For this case, Dr. Brister authored a report and supplemental report, based on Mr. Ellis' LCP prepared by Dr. Cowen, in which he calculated the present value of Mr. Ellis' future life care costs, the present value of Mr. Ellis' lost earnings, and the present value of Mr. Ellis' lost household services, which are as follows:

- Future Life Care Costs (the value of Dr. Cowen's LCP):[1] $3,933,426
- Lost Earnings: $1,094,467
- Lost Household Services: $376,358
- Total Economic Damages = $5,404,251

In this motion, Dr. Vecchione argues that Dr. Brister's methodology is scientifically unsupported and unreliable and further lacks the requisite fit to the facts and evidence in this case, thereby rendering his opinions inadmissible under Rule 702. Dr. Vecchione seeks to exclude three main categories of Dr. Brister's opinions: (1) Dr. Brister's calculation of the present value of Dr. Cowen's LCP; (2) Dr. Brister's calculation of Mr. Ellis' lost household services; and (3) Dr. Brister's calculation of Mr. Ellis' alleged lost earnings. The Court will address each of these in turn. As an initial matter, the Court recognizes that Dr. Vecchione does not dispute that Dr. Brister is qualified to render expert opinions in forensic economics.

1. *Dr. Brister's Calculation of the Present Value of Dr. Cowen's Life Care Plan*

In this motion, Dr. Vecchione argues that Dr. Brister's calculation of the present value of Dr. Cowen's LCP is unreliable and inadmissible and should be excluded based on two theories: (1) that Dr. Brister's opinions are independently, scientifically unreliable and cannot be reconciled with the facts of this case and (2) that his opinions are based upon separate opinions of Mr. Ellis' life care planning expert, Dr. Cowen, which Dr. Vecchione also seeks to exclude via a separate Motion [465].

As to the first theory, Dr. Vecchione argues that Dr. Brister's methodology for estimating the future costs of the expenses in Dr. Cowen's LCP is untested and unsupported by economic literature and is based on statistical data he acknowledges is "inherently arbitrary and demonstrably false." To project future inflation of Dr. Cowen's LCP, Dr. Brister applied a 10-year historical

[1] Dr. Brister notes that he deducted the "House Cleaning" category from Dr. Cowen's LCP. Instead, he included this element of future care in the calculation of "Lost Household Services."

average from 2014 to 2024 of the medical care component of the Consumer Price Index ("CPI"). Based on this data Dr. Brister calculated and applied a growth rate of 2.62% annually to Dr. Cowen's LCP. Mr. Ellis recognizes the Bureau of Labor Statistics' CPI for Medical Care as official government data, published by a nonpartisan federal agency and used by economists, actuaries, and policymakers throughout the United States.

The fact that Dr. Brister used official medical care CPI data does not, by itself, establish the reliability of his assumption that the inflation rate observed from 2014 through 2024 will continue throughout Mr. Ellis' remaining life expectancy. Rule 702 separately requires reliable principles and methods and a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702.

In his motion, Dr. Vecchione points out that Dr. Brister assumes that this growth rate will repeat every 10 years for the remainder of Mr. Ellis' 28-year life expectancy at the same rate it did during the period from 2014 to 2024; however, in his deposition he admits that his methodology is based on untested assumptions and is unsupported by economic literature. [467] Ex. C at 35:20-25; 36:1-15. Additionally, Dr. Brister conceded that he could not reference an economic study that would reenforce his selection of a 10-year period for calculating the medical care component from the CPI as a proper average for projecting future growth, and he admitted that there was not any particular guiding economic principle for why he thought a ten-year period was "better" than a five-year period [467] Ex. C at 38:3-9; 104:2-25. Those admissions directly implicate testing, peer review, governing standards, and acceptance in the relevant economic community, all permissible reliability considerations. *Daubert*, 509 U.S. 579 (1993).

However, the absence of a published study is not independently dispositive. In *Knight v. Kirby Inland Marine Inc.*, the Fifth Circuit stated that an expert need not always support an opinion

with published studies that unequivocally establish the conclusion, and that lack of textual support may concern weight when the expert otherwise reliably employs scientific methods. 482 F.3d 347, 354 (5th Cir. 2007) (internal citations omitted). "Nonetheless, the expert's testimony must be reliable at each and every step or else it is inadmissible." *Id.* at 354-55. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Id.*

Here, the alleged deficiency is not merely that another expert selected a different historical period. In his deposition, Dr. Brister acknowledged that his calculation assumes repetition of the 2014-2024 growth rate, and he agreed that using historical CPI patterns to predict future inflationary patterns would be "inherently arbitrary and demonstrably false."[2] Because those admissions undermine the inferential step connecting the selected historical data to the lifetime projection, the disagreement is not necessarily a jury question concerning which of two otherwise reliable estimates is more persuasive.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.*, 522 U.S. at 146. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (internal citations omitted). On the facts presented

---

[2] In regard to using historical patterns in the CPI to predict "future patterns and inflationary charges," Dr. Brister was asked and gave the following responses:

> Q: And so Dr. Bartlett says "It is often incorrectly suggested that a particular historical pattern observed in some subcomponent of the CPI or even the overall CPI can predict future patterns and inflationary changes. Any such claim is inherently arbitrary and demonstrably false. Prices change as a result of market forces, which do not remain constant. While legitimate forecasting models rely on data, which is inherently historical in nature, that incorporate that data into models that are based on economic principles." Do you see that?
> A: Yes.
> Q: Do you disagree with anything in that statement?
> A: No.

[467] Ex. C at 105:17-25; 106:1-8.

here, Dr. Brister's admissions leave no identified testing, literature, accepted economic principle, governing standard, or other objective validation supporting the critical choice to extrapolate the 2014-2024 rate across Mr. Ellis' purported life expectancy.

The Court acknowledges that Dr. Brister did offer an explanation as to why he specifically chose a 10-year period. In his deposition, Dr. Brister stated that it is up to the economist to determine how many years they want to use, but that he uses ten years because "it gives a much lower number for the growth rate than if I use 20…[and he] tried to be conservative and not come up with a number for inflation that is not indicative of what it might be in the future" [467] Ex. C at 37:4-25; 38:1-2. Dr. Brister's explanations delineate why he rejected a twenty-year period; however, they do not demonstrate that extrapolating the selected ten-year rate over Mr. Ellis' life expectancy satisfies Rule 702's reliability requirements. Expert assurances that a methodology is generally accepted are insufficient without objective, independent validation, although the proponent need not prove that the resulting opinion is correct. *In re: Taxotere (Docetaxel) Prods. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022). Accordingly, Dr. Brister's opinion calculating the present value of Dr. Cowen's Life Care Plan after increasing its costs annually by 2.62% shall be excluded.

Additionally, Dr. Vecchione argues that Dr. Brister improperly relies on Dr. Cowen's calculations of the price of Mr. Ellis' medications despite his admission that these calculations are not supported by economic principles and elected not to account for available data specific to Mr. Ellis. Federal Rule of Evidence 703 permits an expert to "base an opinion on facts or data the expert has been made aware of or personally observed." Fed. R. Evid. 703. Additionally, "if experts in the particular field would reasonably rely on those facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." *Id.*

In his deposition, Dr. Brister testified that he is not qualified to address healthcare pricing but acknowledged, based on economic behavior it is logical that a consumer would choose the lower priced drug if the brand name drug and generic drug were absolutely equal. [467] Ex. C at 106:14-25-108:1-8. Additionally, Dr. Brister testified that he did not feel qualified to second-guess a life care planner's medical pricing decisions. [476] Ex. E at 71:10-11. The Court agrees that Dr. Brister's statement that he is not qualified to change Dr. Cowen's numbers is not a methodological flaw; rather, it reflects the appropriate scope of an economist's role under Rule 703.

Dr. Brister also admitted he did not investigate Mr. Ellis' past medication purchasing habits or inquire whether Mr. Ellis chooses branded or generic medications. [467] Ex. C at 108:9-25; 109:1-14. Dr. Vecchione's argument that Dr. Brister independently violated economic principles by accepting Dr. Cowen's averaged brand and generic pricing rather than applying the least cost consumer choice principle does not rise to the level of a *Daubert* exclusion. Dr. Vecchione's contention that Dr. Brister should have independently investigated Mr. Ellis' medication purchasing habits is precisely the type of weight and credibility challenge that is properly addressed through cross-examination and competing expert testimony, not exclusion. "It is the role of the adversarial system, not the court, to highlight weak evidence…" *Price c. Galliano Marine Serv., L.L.C.*, 694 F. Supp. 3d 748, 755 (E.D. La. 2023) (internal citations and quotations omitted).

Previously in this Order, the Court found Dr. Cowen's medication cost methodology sufficiently reliable to avoid wholesale exclusion and determined that the asserted failure to review pharmacy records and brand-substitution information goes to weight and not credibility. However, the Court elected to limit Dr. Cowen's opinion precluding him from justifying the brand-name pricing component solely on the basis of hypothetical future brand-only medications, given that the current medications listed in the life care plan have a generic equivalent and no plaintiff-

specific evidence supports the brand-name premium. Thus, Dr. Brister may not preserve through his economic calculation a substantive medication cost premise that the Court prohibits Dr. Cowen from using. The present-value calculation must therefore be revised, limited, or presented with an appropriate exclusion so that Dr. Brister does not capitalize or discount a brand-name premium justified solely by hypothetical future brand-only medications.

2. *Dr. Brister's Calculation of Lost Household Services*

Dr. Brister calculated the present value of Mr. Ellis' lost household services using "The Dollar Value of a Day," based on the American Time Use Survey (a government survey conducted by the U.S. Bureau of Labor and Statistics) and published by Expectancy Day. Additionally, Dr. Brister adjusted the national hourly rates downward to reflect Mississippi wage levels. [476] Ex. E at 59:13-22. Dr. Brister admitted that "The Dollar Value of a Day" is not peer-reviewed in the traditional academic sense. [467] Ex. C at 57:12-25; 58:1-15. He also admitted that the publication does not include the raw government data from the American Time Use Survey, and he did not personally perform any calculation from the raw government data. [467] Ex. C at 59:23-60:7.

The publication's lack of traditional peer review, by itself, does not warrant exclusion. Nor does Dr. Brister's failure to independently reprocess the American Time Use Survey necessarily render the publication unreliable. Rule 703 permits an expert to rely on facts or data made known to the expert, including otherwise inadmissible evidence, if experts in the particular field would reasonably rely on those kinds of facts or data when forming an opinion on the subject. Fed. R. Evid. 703.

In his response, Mr. Ellis states that "The Dollar Value of a Day" publication "is a recognized and widely used source for valuing household services," and "Courts throughout the country have regularly admitted expert testimony based on 'The Dollar Value of a Day' and similar

publications." However, in support of these statements Mr. Ellis only cites *Davis v. ROCOR Intern.*, 226 F. Supp. 2d 839 (S.D. Miss. 2002), stating that this case analyzed, rather than categorically excluded, household services testimony based on similar publications. Upon review of the case, the Court finds that this characterization misrepresents the case. Indeed, the court in *Davis* found that the forensic economist's opinion that Plaintiffs had sustained a forty percent loss of household services is not supported by any evidence in the record and that the economist was not independently qualified to make that determination. This mischaracterization is very concerning to the Court. That said, the Court warns Mr. Ellis' counsel that it is of the upmost importance that they take care to accurately portray and cite to pertinent authorities.

Although Mr. Ellis has not provided authority establishing the extent to which "The Dollar Value of a Day" is recognized and utilized by forensic economists, this Court's experience is that the publication is a widely used source of household services productivity metrics within the forensic economics community. William H. Rodgers & John O. Ward, *The Dollar Value of a Day through Two Decades*, 31 J. LEGAL ECON. (2025). According to *The Dollar Value of a Day through Two Decades* article published in the Journal of Legal Economics, "The Dollar Value of a Day" has also been widely accepted by courts and economists as a reliable resource for calculating economic damages. *Id.*

Dr. Vecchione also argues Dr. Brister's methodology is unreliable because he assumed Mr. Ellis could not perform any household services, rather than determining which household tasks or activities Mr. Ellis is capable or incapable of performing. It is evident in the record that Mr. Ellis sustained catastrophic spinal injuries requiring continued, full-time home health assistance. In light of the severity of these injuries and their resulting functional limitations, the Court finds that Dr.

Brister reasonably assumed that Mr. Ellis is unable to perform the household services he that he performed pre-injury. Thus, this assumption is not speculative.

Likewise, Dr. Vecchione argues that Dr. Brister double-counted by including a lost household services calculation while Dr. Cowen's LCP also includes housekeeping and home health aide expenses. In his deposition, Dr. Brister addressed this potential overlap. He testified that he deducted the "house cleaning" line item from Dr. Cowen's LCP to avoid double-counting. [476] Ex. E at 31:3-25. Additionally, he explained that home health aide costs in the LCP compensate for Mr. Ellis' need for personal care assistance due to his injuries, and the household services calculation compensates for the value of services Mr. Ellis would have provided to himself and his household members had he not been injured. [476] Ex. E at 32:2-25; 33:1-24.

The Court finds Dr. Vecchione's arguments tiresome in this regard. The Court declines to exclude Dr Brister's calculation of Mr. Ellis' lost household services. Dr. Vecchione will have ample opportunity to present evidence and competing expert testimony concerning Mr. Ellis' actual physical capabilities and limitations, to establish the alleged value of Mr. Ellis' lost household services, and he will be given wide latitude to cross-examine Dr. Brister on these matters.

3. *Dr. Brister's Calculation of Mr. Ellis' Lost Earnings*

Dr. Vecchione argues that Dr. Brister's calculation of Mr. Ellis' lost earnings is the product of an unreliable methodology warranting exclusion of these calculations and opinions. Dr. Brister calculated Mr. Ellis' lost earnings based on his 2021 income of $75,030 from Triple E Livestock (Auction) Sales, LLC. Based on this, Dr. Brister assumes Mr. Ellis, but for his injury, would have earned $75,030 annually throughout the remainder of his work life expectancy. Dr. Brister did not select this figure without an identified evidentiary basis. Dr. Brister chose Mr. Ellis' 2021 income

from Triple E because it was the last full calendar year before Mr. Ellis' injury occurred in April 2022, and Mr. Ellis explained that this approach uses the earnings level he most recently demonstrated the capacity to achieve. This provides a discernible factual premise and economic rationale rather than a bare assurance that the projected earnings figure is reasonably accurate.

The Court acknowledges that Mr. Ellis' increase in income from $9,522 in 2019 and $26,960 in 2020 to $75,030 in 2021, regarding Triple E, provides grounds for questioning whether the selected year reliably represents Mr. Ellis' future earning capacity. However, an economic methodology need not be perfect to be admissible. Where it captures the relevant subject matter, any potential under- or over-inclusiveness may be tested through the adversarial process at trial rather than used as a basis for exclusion. Here, the Court finds that the annual variation is an appropriate subject for cross-examination and competing calculations.

Dr. Vecchione argues that, in calculating Mr. Ellis' lost earnings, Dr. Brister should have offset approximately $34,000 in losses incurred by Mr. Ellis' livestock farming business. The Court finds that Dr. Brister articulated a factual and economic reason for excluding the farm losses. In his deposition, Dr. Brister admitted that he excluded Mr. Ellis' livestock farming business losses from his calculations because he considered Mr. Ellis' auction business as a completely separate business from his farm business and stated, "they didn't depend on each other". [476] Ex E. at 45:4-6. Additionally, Mr. Ellis told Dr. Brister it was his recreation, and Dr. Brister considered it just that. [467] Ex. C at 44:11-45:16. Dr. Brister also admits that Mr. Ellis did sell some horses he had raised on his farm at his auction but for many years he had not. [476] Ex E. at 46:8-47:17. Dr. Brister states that Mr. Ellis did not have to sell his horses at the auction and that Mr. Ellis had expressed to him that he could have easily done the auction without selling any of his horses. *Id.*

Dr. Vecchione points out that Dr. Brister admitted he did not investigate whether certain expenses overlapped between both of Mr. Ellis' businesses. Thus, Dr. Vecchione argues that Mr. Ellis' auction and livestock farm were economically integrated and the farm losses should be netted against his auction income. However, the Court finds that Dr. Brister's decision to treat the two businesses as separate entities has identified factual support.

Lastly, Dr. Brister's assumption that Mr. Ellis will have no post-injury earnings has a record basis. Mr. Ellis informed Dr. Brister that he was not working, his LCP projects that he will require continued home aide services daily, and Dr. Vecchione's experts also assumed Mr. Ellis had no post-injury earned income going forward. Dr. Vecchione will again be given ample opportunity at trial to explore on cross-examination, or offer competing expert testimony.

## IV. CONCLUSION

For the reasons stated above,

**IT IS, THEREFORE, ORDERED** that Defendant David Vecchione, M.D.'s Motion to Exclude Certain Opinions of Plaintiff's Expert, Rafal Kedzierski, M.D. [463]; Motion to Exclude Certain Opinions and Testimony of Plaintiff's Life Care Planning Expert, Todd Cowen, M.D. [465]; and Motion to Exclude Opinions and Testimony of Plaintiff's Economist, and Bill Brister, Ph.D. [467] are **GRANTED in part** and **DENIED in part**.

**SO ORDERED**, this the 27th day of October, 2026.

/s/Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI